# In the United States Court of Federal Claims

No. 09-538 C

(Filed December 23, 2010)

* * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| CHRISTOPHER MEYERS, | * | Motion to Dismiss for Lack of |
| KATHERINE MEYERS, | * | Subject Matter Jurisdiction, |
| SARA MEYERS STARWALT, and | * | RCFC 12(b)(1); Motion to Dismiss |
| TARA MEYERS CASLEBERRY, | * | for Failure to State a Claim, |
| dba MEYERS RANCHES, | * | RCFC 12(b)(6); Tucker Act, |
| | * | 28 U.S.C. § 1491(a)(1) (2006); |
| *Plaintiffs*, | * | Money-Mandating Source of Law; |
| | * | Conservation Security Program, |
| v. | * | 16 U.S.C. §§ 3838-3838c (2006); |
| | * | Fifth Amendment Takings Claim. |
| THE UNITED STATES, | * | |
| | * | |
| *Defendant*. | * | |

* * * * * * * * * * * * * * * * * * * *

*Alan I. Saltman*, Washington, DC, for plaintiffs. *Ruth G. Tiger* and *Aron C. Beezley*, Washington, DC, of counsel.

*Kenneth D. Woodrow*, United States Department of Justice, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director, Washington, DC, for defendant.

_____

## OPINION

_____

**BUSH,** *Judge.*

Now pending before the court is defendant's motion to dismiss, which has been fully briefed and is ripe for a decision by the court. Because this court lacks

jurisdiction over Counts I and II of plaintiffs' complaint, those counts must be dismissed pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC). With respect to Count III of the complaint, the court holds that plaintiffs have failed to state a claim upon which relief can be granted. Accordingly, Count III of the complaint must be dismissed pursuant to RCFC 12(b)(6). For those reasons, defendant's motion to dismiss is hereby granted.

## BACKGROUND[1]

In this case, the owners and operators of two cattle ranches seek damages under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2006), for payments they would have received from the government if they had been allowed to participate in an agricultural conservation program authorized by Congress. Under the program, potential participants develop and submit for approval plans to adopt specified conservation practices on their agricultural property. Upon the government's approval of such a plan, the participant then enters into a written contract with the government to implement the approved conservation practices in exchange for financial assistance. In response to spending limitations imposed by Congress, the agency charged with implementing the statute limited eligibility for the program to properties located within several watersheds designated by the agency on an annual basis. Because their property was not located within any of the designated watersheds, plaintiffs did not enroll in the program. Plaintiffs now seek monetary damages for the payments they would have received if they had been allowed to participate in the program between 2004 and 2010. In the alternative, plaintiffs allege that the government has taken their property without compensation in violation of the Takings Clause of the Fifth Amendment.

## I.    Factual History

### A.    The 2002 Farm Bill and the Conservation Security Program

In May 2002, Congress enacted the Farm Security and Rural Investment Act of 2002 (the 2002 Farm Bill), Pub. L. No. 107-171, 116 Stat. 134. Compl. ¶ 5. The 2002 Farm Bill amended several portions of the Food Security Act of 1985

---

[1] The facts recounted here are taken from the parties' submissions. For the limited purposes of its motion to dismiss, defendant accepts as true all of the allegations set forth in the complaint. *See* Def.'s Mot. at 1 n.1.

(the 1985 Farm Bill), Pub. L. No. 99-198, 99 Stat. 1354 (codified as amended at 16 U.S.C. §§ 3801-3862 (2006)), and created a voluntary conservation program known as the Conservation Security Program (CSP), which is now codified as amended at sections 3838 through 3838c in Title 16 of the United States Code (the CSP statute).  Compl. ¶ 6.

Under the CSP, defendant provides financial and technical assistance to eligible producers who adopt specified conservation practices on eligible land.[2] The CSP statute explains that the purpose of the program is "to assist producers of agricultural operations in promoting, as is applicable with respect to land to be enrolled in the program, conservation and improvement of the quality of soil, water, air, energy, plant and animal life, and any other conservation purposes, as determined by the Secretary."  16 U.S.C. § 3838a(a).  The CSP statute defines the Secretary as "the Secretary of Agriculture, acting through the Chief of the Natural Resources Conservation Service [(NRCS)]."  16 U.S.C. § 3838(12).  As originally enacted, the legislation required the NRCS to establish and implement the CSP in each of fiscal years (FY) 2003 through 2007.  116 Stat. 225.  Congress later extended authorization for the CSP through FY2011.  *See* Deficit Reduction Act of 2005, Pub. L. No. 109-171, tit. I, § 1202, 120 Stat. 4, 5-6.

The CSP statute provides that eligible land includes private working lands such as "cropland, grassland, prairie land, improved pasture land, and rangeland," as well as "land under the jurisdiction of an Indian tribe . . . and forested land that is an incidental part of an agricultural operation . . . ."  16 U.S.C. § 3838a(b)(2). However, the statute further provides that working lands that are already enrolled in the Conservation Reserve Program, the Wetlands Reserve Program or the Grassland Reserve Program are not eligible for enrollment in the CSP.  16 U.S.C. § 3838a(b)(3).  In addition, the statute provides that any previously uncultivated land converted to cropland following the enactment of the 2002 Farm Bill is similarly ineligible for enrollment in the CSP.  *Id.*

In order to become eligible for participation in the CSP, an agricultural

---

[2] The CSP statute defines a producer as "an owner, operator, landlord, tenant, or sharecropper" who "shares in the risk of producing any crop or livestock" and "is entitled to share in the crop or livestock available for marketing from a farm (or would have shared had the crop or livestock been produced)."  16 U.S.C. § 3838(9).  Defendant does not dispute that plaintiffs are "producers" as that term is defined in the legislation.

producer must:

> (A)   develop and submit to the Secretary, and obtain the
> approval of the Secretary of, a conservation
> security plan that meets the requirements of
> subsection (c)(1) of this section; and
>
> (B)   enter into a conservation security contract with the
> Secretary to carry out the conservation security
> plan.

16 U.S.C. § 3838a(b)(1).

Under the CSP statute, potential participants in the program must first
develop a conservation security plan to be approved by the NRCS.  The statute
provides that all such plans must identify the land and resources to be protected,
must describe the specific conservation practices to be implemented, must set forth
a schedule for the implementation and maintenance of those practices, and must
indicate the tier of the conservation security contract under which the plan will be
implemented.  16 U.S.C. § 3838a(c)(1).  In determining which conservation
practices are eligible for compensation under the program, and the applicable
criteria for implementing and maintaining those conservation practices, the NRCS
is directed to consult its National Handbook of Conservation Practices.  16 U.S.C.
§ 3838a(d)(3)(A).  Although the eligibility of specific conservation practices is to
be determined by the NRCS, the CSP statute sets forth a list of various broad
categories of practices that a producer may implement under a conservation
security plan.  16 U.S.C. § 3838a(d)(4).

Once the NRCS has approved a producer's conservation security plan, it
must enter into a conservation security contract with that producer to enroll the
land covered by the plan in the CSP.  16 U.S.C. § 3838a(e)(1).  The CSP statute
directs the NRCS to offer eligible producers three tiers of conservation security
contracts – Tier I, Tier II and Tier III – pursuant to which CSP payments may be
made to such producers.  16 U.S.C. §§ 3838a(d)(1)(A), 3838a(d)(5).  The three
contract tiers differ from one another in their duration, the number of natural
resources that must be protected, and the portion of the agricultural operation on
which the specified conservation practices must be applied.  *See id.*  Although the
CSP statute sets forth general requirements for the three contract tiers, the statute
provides that the specific minimum requirements for each contract tier are to be

4

determined and approved by the NRCS.  16 U.S.C. § 3838a(d)(6).

Under the CSP statute, the government is authorized to make an annual payment to each eligible producer who has entered into a conservation security contract with the NRCS.  Annual payments under such contracts are composed of as many as three separate components:  a specified percentage of the base payment (which the court will refer to here as the "adjusted base payment"); a cost-sharing payment; and an enhanced payment.  The CSP statute provides that the base payment is equal to the 2001 average national per-acre rental rate for the particular type of land use covered by the contract.  16 U.S.C. § 3838c(b)(1)(A).  In the alternative, the statute provides that the NRCS may instead adopt as the base payment "another appropriate rate for the 2001 crop year that ensures regional equity." *Id.*  Once the NRCS has determined the applicable base payment for the enrolled property, the adjusted base payment is calculated according to the appropriate contract tier for that property.  For Tier I, Tier II and Tier III contracts, the adjusted base payment is equal to five percent, ten percent and fifteen percent, respectively, of the applicable base payment.  *See* 16 U.S.C. §§ 3838c(b)(1)(C)(i), 3838c(b)(1)(D)(i), 3838c(b)(1)(E)(i).

The CSP statute also provides for cost-sharing payments, which reimburse eligible producers for the cost of adopting and maintaining both new and existing conservation practices on their properties.  In general, eligible producers may receive up to seventy-five percent of the 2001 average county cost of approved practices implemented pursuant to a conservation security contract.  *See* 16 U.S.C. §§ 3838c(b)(1)(C)(ii), 3838c(b)(1)(D)(ii), 3838c(b)(1)(E)(ii).  In addition, "beginning farmers or ranchers" may receive a higher cost-sharing payment of up to ninety percent of the 2001 average county cost of the conservation practices implemented under their contracts.  *Id.*

Finally, eligible producers may receive an enhanced payment for the adoption or maintenance of certain conservation practices that exceed the minimum requirements for the applicable tier of conservation security contract.  *See* 16 U.S.C. § 3838c(b)(1)(C)(iii).  Enhanced payments may be received for addressing local conservation priorities, participating in a research or pilot project and in other limited circumstances.  *See id.*  The CSP statute provides that, regardless of the applicable contract tier, such enhanced payments are to be determined by the NRCS.  *See* 16 U.S.C. §§ 3838c(b)(1)(C)(iii), 3838c(b)(1)(D)(iii), 3838c(b)(1)(E)(iii).

The total annual payment to an eligible producer is the sum of the adjusted base payment, the cost-sharing payment and the enhanced payment to which a producer is entitled under its conservation security contract. The CSP statute provides that the total annual payment received by a producer may not exceed $20,000 for a Tier I contract, $35,000 for a Tier II contract, or $45,000 for a Tier III contract. *See* 16 U.S.C. § 3838c(b)(2)(A). In addition, the adjusted base payment component of the total annual payment under a conservation security contract may not amount to more than $5000 for a Tier I contract, $10,500 for a Tier II contract, or $13,500 for a Tier III contract. *See* 16 U.S.C. § 3838c(b)(2)(B).

**B.      Congressional Spending Limitations and Implementation of the CSP**

The 2002 Farm Bill provided that the CSP would be funded through the Commodity Credit Corporation (CCC). Compl. ¶ 12. The CCC is a federal corporation that provides financing for various agricultural programs administered by the United States Department of Agriculture (USDA). Pls.' Suppl. Br. at 16; *see* 15 U.S.C. § 714 (2006). The 2002 Farm Bill initially provided an unlimited source of CCC funds for the CSP. However, Congress subsequently imposed a number of annual and multi-year spending limitations on the program. In addition, the CSP statute itself provides that technical assistance expenditures under the program may account for no more than fifteen percent of total expenditures on the CSP in each fiscal year of its implementation. 16 U.S.C. § 3838c(g).

In June 2004, the NRCS promulgated implementing regulations for the CSP. Interim Final Rule, 69 Fed. Reg. 34502 (June 21, 2004) (codified as amended at 7 C.F.R. §§ 1469.1-1469.36 (2010)). In response to the fifteen-percent limitation on technical assistance expenditures and the various spending limitations imposed by Congress, the implementing regulations included a number of eligibility requirements and other provisions that were not contained in the CSP statute. Most significant to plaintiffs' claims here, the regulations limited participation in each fiscal year to those properties located within one of several "priority watersheds" designated by the NRCS on an annual basis. The NRCS surmised that the use of selected watersheds, while initially limiting the overall number of eligible producers, would ultimately allow the implementation of the CSP to be spread throughout all fifty states, the Carribean and the Pacific basin.

Between FY2004 and FY2008, the NRCS administered the CSP in

6

accordance with its implementing regulations and limited annual spending on the program to the amounts specified in the various spending limitations imposed by Congress.  *See* Plaintiffs' Proposed Findings of Uncontroverted Fact (PPFUF) ¶¶ 43, 46-47, 49-50, 53, 59, 68.  During that time, the NRCS allowed the owners of properties located within a total of approximately 300 designated watersheds to enroll in the program.  *See* PPFUF ¶¶ 43, 47, 50, 68.  The owners of properties located outside of those designated watersheds were not allowed to enroll in the program.

In May 2008, Congress passed the Food, Conservation, and Energy Act of 2008 (the 2008 Farm Bill), Pub. L. No. 110-234, 122 Stat. 923, which replaced the CSP with a new conservation program, *see* 16 U.S.C. §§ 3838e-3838g (Supp. II 2008), and further provided that the NRCS was not authorized to enter into any new CSP contracts after September 30, 2008, *see* 16 U.S.C. § 3838a(g)(1) (Supp. II 2008).  However, the statute further provided that all CSP contracts executed before that date – as well as those CSP contracts executed after that date for which an application was received by the NRCS during the 2008 sign-up period – would continue to receive payments under the program.  *See* 16 U.S.C. §§ 3838a(g)(2), 3841(a)(3)(A) (Supp. II 2008).

## C.    Plaintiffs and Their Property

Christopher Meyers, Katherine Meyers, Sara Meyers Starwalt, and Tara Meyers Casleberry, doing business as Meyers Ranches (plaintiffs) are the owners and operators of two cattle ranches (the Property) located in Oregon.[3]  Compl. ¶ 2; PPFUF ¶ 1.  One of the two ranches is located within the Silvies, Upper Crooked and Upper Malheur watersheds, while the other ranch is located within the South Fork Willamette watershed.  Compl. ¶ 3.  The Property is not located within any of the watersheds designated by the NRCS for participation in the CSP.  *Id.* ¶ 4.  Plaintiffs assert that, with the sole exception of the geographic requirement,

---

[3]/   The complaint states that Christopher Meyers is the owner and operator of the two cattle ranches involved in this case, but does not mention the other named plaintiffs. Compl. ¶ 2. However, plaintiffs also state that all four of the named plaintiffs in this case are the owners and operators of the ranches.  PPFUF ¶ 1.  Because plaintiffs have identified no other independent basis for their standing to bring this suit, and in the absence of any challenge lodged by defendant, for purposes of this opinion the court will assume that all four of the named plaintiffs are the owners and operators of the cattle ranches.

plaintiffs and the Property meet all of the specific requirements for CSP eligibility set forth in the 2002 Farm Bill and its implementing regulations. *Id.* Plaintiffs have never filed a notice of intention to enroll in the CSP. Plaintiffs have not attempted to submit a conservation security plan to defendant for approval, nor have they entered into a conservation security contract with defendant.

## II.   Procedural History

On August 14, 2009, plaintiffs filed a three-count complaint in this court. In Counts I and II of the complaint, plaintiffs argue that defendant violated the CSP statute by limiting participation in the CSP to properties located within the specific watersheds designated by the NRCS. The only distinction between the first two counts of the complaint is the period of time covered. Count I of the complaint relates to the interval between May 25, 2007 and September 30, 2008, a period during which there were no annual spending limitations on the program. Count II of the complaint covers FY2004 and FY2005, a period in which annual spending on the program was subject to various limitations imposed by Congress. In Count III of the complaint, plaintiffs argue that, to the extent that any spending limitations imposed by Congress extinguished defendant's obligation to make CSP payments, such spending limitations effected an uncompensated taking of plaintiffs' property under the Fifth Amendment. With respect to Counts I and II, plaintiffs seek damages in the amount that plaintiffs would have received if they had been allowed to participate in the CSP. With respect to Count III of the complaint, plaintiffs request just compensation for the alleged taking of their property.

On January 4, 2010, defendant filed a motion to dismiss the complaint under RCFC 12(b)(1) and RCFC 12(b)(6).[4] In its motion, defendant argues that this court does not possess subject matter jurisdiction over Counts I and II of plaintiffs' complaint because the CSP statute is not a money-mandating source of law. Defendant further argues that all three counts of the complaint should be dismissed for failure to state a claim upon which relief can be granted. In that regard, defendant first asserts that plaintiffs have failed to demonstrate a presently due entitlement to monetary benefits under the CSP. Next, defendant contends that this court lacks the authority to declare the CSP regulations invalid, and that such a

---

[4]/ Also pending before the court is plaintiffs' motion for summary judgment on Count I of the complaint. The court directed that all briefing be suspended on plaintiffs' motion pending its resolution of defendant's motion to dismiss.

declaration would be a necessary prerequisite to awarding plaintiffs damages in this case. Finally, defendant avers that plaintiffs are not entitled to just compensation under the Takings Clause of the Fifth Amendment because they do not possess any protected property rights in financial assistance under the CSP.

Plaintiffs filed their response to defendant's pending motion to dismiss on March 5, 2010. In their response, plaintiffs argue that the CSP statute is a money-mandating source of law because it does not provide the NRCS with discretion to determine which agricultural producers are eligible to participate in the CSP. Plaintiffs further argue that, even if the CSP statute confers such discretion upon the NRCS, the statute is nonetheless money mandating because it sets forth clear standards for determining the precise amount of money due to each eligible producer. In addition, plaintiffs assert that Counts I and II of the complaint allege an entitlement to payments that are presently due under the CSP statute. Finally, plaintiffs claim that their asserted benefits under the CSP are indeed "property" for purposes of the Takings Clause of the Fifth Amendment because plaintiffs have a legitimate claim of entitlement to them, and the CSP statute requires that benefits under the program be reduced to a contract between the government and the recipient of such benefits.

Defendant replied to plaintiffs' response on March 26, 2010. In its reply, defendant challenges plaintiffs' assertion that the NRCS lacks discretion to limit participation in the CSP. According to defendant, the statutory authorization for the program provides substantial discretion to the NRCS to determine which agricultural producers are eligible to receive payments under the program and which conservation practices are eligible for compensation. In light of that discretion, defendant further argues that the CSP is not money mandating because the statute authorizing the program does not provide clear standards for payment, does not state the precise amounts to be paid, and does not compel payment upon the satisfaction of any specified conditions. Defendant avers that plaintiffs have failed to establish a present entitlement to payment under the program because they have failed to meet the requirements set forth in the CSP statute and implementing regulations. Finally, defendant argues that payments under the CSP are not property rights, and that CSP contracts are not sufficiently binding on the government to create any cognizable property rights under the Fifth Amendment.

The court heard oral argument on defendant's motion on June 15, 2010. During oral argument, the court asked the parties to address whether defendant's

interpretation of the CSP statute, as embodied in the CSP regulations, was entitled to any deference under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) (*Chevron*), or under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) (*Skidmore*). Plaintiffs assert that the CSP statute unambiguously requires the NRCS to open the program to all agricultural producers who meet the limited requirements set forth in the statute. Defendant, in contrast, contends that the language of the CSP statute confers complete discretion upon the NRCS to determine which producers are eligible for participation in the program. In short, both parties assert that the language of the statute is unambiguous, but each draws a different conclusion with respect to whether that statutory language provides the NRCS with the requisite discretion to limit participation in the program based on criteria not expressly set forth in the statute.

Because both parties asserted that the express language of the CSP statute is unambiguous, neither party addressed in initial briefing or during oral argument the degree of deference, if any, the court must afford to defendant's interpretation of any ambiguous language contained in the statute. For that reason, the court ordered supplemental briefing from the parties on the following issues, as paraphrased below:

1.    Assuming the CSP statute is ambiguous with respect to whether the NRCS may limit participation in the program based on eligibility requirements not contained in the statute, is the agency's interpretation of the statute, as embodied in the CSP regulations, entitled to *Chevron* or *Skidmore* deference?

2.    If the agency has discretion under the statute to limit participation in the CSP, is the watershed approach a reasonable exercise of the discretion conferred by the statute?

3.    If the NRCS had discretion under the CSP statute to limit program eligibility, does the exercise of that discretion through the CSP regulations affect whether the statute and regulations are a money-mandating source of law?

10

> 4.      If the court determines that the NRCS did not have
>         discretion under the CSP statute to limit eligibility,
>         discuss whether the court has the authority to
>         declare the CSP regulations invalid pursuant to 28
>         U.S.C. § 1491(a)(2) (2006) or whether there is any
>         other legal basis for the court's authority to declare
>         the regulations invalid.

*See* Order of June 25, 2010 at 2-3.[5]

The parties filed their supplemental briefs on August 12, 2010.  Therein,
plaintiffs argue that, even if the court determines that the language of the CSP
statute is ambiguous, defendant's interpretation of that language is not entitled to
deference because it is based upon an impermissible construction of the statute.
According to plaintiffs, the watershed approach employed by defendant contradicts
the clear purposes of the CSP statute, particularly a congressional intent that the
CSP be made available to all agricultural producers.  Next, plaintiffs contend that
the watershed approach represents an unreasonable exercise of agency discretion.
Plaintiffs assert that defendant could have responded to the spending limitations
imposed upon the CSP without undermining the objectives of the program.  With
respect to the court's third question, plaintiffs concede that – assuming defendant
does in fact possess discretion under the statute to determine eligibility for the
program – the CSP statute would not be a money-mandating source of law under
the test set forth in *Grav v. United States*, 886 F.2d 1305, 1307 (Fed. Cir. 1989).
Nonetheless, plaintiffs argue that the CSP statute would still be money mandating
under the alternative standard articulated in *Samish Indian Nation v. United States*,
419 F.3d 1355, 1364-65 (Fed. Cir. 2005) (*Samish II*).  Finally, with respect to the
court's fourth question, plaintiffs contend that there would be no need to invalidate
the CSP regulations if the court determines that the CSP statute created an

---

[5]/  In addition to the questions noted above, the court also instructed the parties to address
whether the non-appropriated funds doctrine was at all relevant to the instant suit by virtue of the
fact that the program receives its funds not from congressional appropriations, but from the
CCC.  Both parties agree that the doctrine is inapplicable in this case because the CCC itself
receives substantial appropriations from Congress and thus fails to meet the test for a non-
appropriated funds instrumentality set forth in *AINS, Inc. v. United States*, 365 F.3d 1333 (Fed.
Cir. 2004).

entitlement program obligating the government to make payments to any producer who meets the express statutory requirements of the program. Plaintiffs further assert, however, that the court does possess the authority to declare the CSP regulations invalid if such a declaration is an "incident of and collateral to" the court's jurisdiction to award monetary damages.

Not surprisingly, defendant, on the other hand, argues that its interpretation of the CSP statute, as embodied in the agency's implementing regulations, is entitled to *Chevron* deference because those regulations were the product of notice-and-comment rulemaking. With respect to the second question, defendant contends that the watershed approach was a reasonable exercise of its discretion in that it provided a means of addressing the funding limitations of the program in a manner consistent with the purposes of the CSP statute. Defendant further argues that the reasonableness and propriety of the watershed approach are not dependent upon whether the program was actually subject to a spending limitation in any particular year. According to defendant, the watershed approach was a reasonable response to the fifteen-percent limitation on technical assistance expenditures as well as the uncertainty of future funding for the program. Next, defendant contends that the CSP statute is not money mandating because it affords significant discretion to the NRCS in determining eligibility and payments under the program. Nor does the statute, according to defendant, meet the requirements for a money-mandating discretionary statute as set forth in *Samish II*. Finally, defendant asserts that a declaration that the CSP regulations are invalid would not be incidental and subordinate to an award of damages; on the contrary, defendant contends that declaratory relief would be a necessary predicate to any award of monetary damages. For that reason, defendant argues that the relief requested by plaintiffs in this case does not fall within the express authority granted to the court under section 1491(a)(2), or any other basis cited by plaintiffs.[6]

---

[6]/ Subsequent to oral argument and supplemental briefing, on September 30, 2010, plaintiffs filed a motion for class certification, requesting that the court designate plaintiffs as representatives of the class and plaintiffs' counsel as attorneys of record for the class. Plaintiffs also filed a motion to amend their complaint for the purpose of accommodating potential class members in their proposed class action. On October 21, 2010, the court suspended all further briefing of those motions pending the resolution of defendant's motion to dismiss. Because plaintiffs' complaint is dismissed in its entirety, the motions for class certification and to amend the pleadings are dismissed as moot. *See Greenlee County, Ariz. v. United States*, 487 F.3d 871, 880 (Fed. Cir. 2007) ("Although the parties agree that we have never directly addressed the

continue...

# DISCUSSION

## I.     Standards of Review

### A.     Standard of Review under RCFC 12(b)(1)

In rendering a decision on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), this court must presume all undisputed factual allegations to be true and must construe all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814-15 (1982); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). The relevant issue in a motion to dismiss under RCFC 12(b)(1) "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Patton v. United States*, 64 Fed. Cl. 768, 773 (2005) (quoting *Scheuer*, 416 U.S. at 236). The plaintiff bears the burden of establishing subject matter jurisdiction, *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)), and must do so by a preponderance of the evidence, *Reynolds*, 846 F.2d at 748 (citations omitted). The court may look at evidence outside of the pleadings in order to determine its jurisdiction over a case. *Martinez v. United States*, 48 Fed. Cl. 851, 857 (2001) (citing *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461-62 (Fed. Cir. 1998); *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)), *aff'd in relevant part*, 281 F.3d 1376 (Fed. Cir. 2002). "Indeed, the court may, and often must, find facts on its own." *Id.* If jurisdiction is found to

---

[6]/ ...continue
issue, we have repeatedly found on appeal that issues related to class certification were moot in light of our resolution against the plaintiff of a motion to dismiss or for summary judgment. We see no reason to apply a different rule when it is the Court of Federal Claims that finds the issue moot.") (citations omitted); *Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1337-38 (Fed. Cir. 2004) (holding that class certification issues were moot in light of the court's holding that the government was not liable to the plaintiffs in that case); *Greenbrier v. United States*, 193 F.3d 1348, 1360 (Fed. Cir. 1999) (same); *Figueroa v. United States*, 66 Fed. Cl. 139, 153 (2005) (denying a motion for class certification as moot because the court had granted the government's motion for summary judgment), *aff'd*, 466 F.3d 1023 (Fed. Cir. 2006); *Bay View, Inc. v. United States*, 46 Fed. Cl. 494, 495 n.3 (2000) (denying a motion for class certification as moot, following an initial stay of that motion, because the court had dismissed the complaint), *aff'd*, 278 F.3d 1259 (Fed. Cir. 2001).

be lacking, this court must dismiss the action.  RCFC 12(h)(3).

### B.  Standard of Review under RCFC 12(b)(6)

It is well-settled that a complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  When considering a motion to dismiss under this rule, "the allegations of the complaint should be construed favorably to the pleader."  *Scheuer*, 416 U.S. at 236.  "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief," dismissal is warranted under Rule 12(b)(6).  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

## II.  Analysis of Plaintiffs' Claims

The court must resolve two principal questions in this case.  First, do the statutes and regulations creating the CSP constitute a money-mandating source of law that provides a sufficient basis for the exercise of subject matter jurisdiction over plaintiffs' suit under the Tucker Act?  And second, are plaintiffs entitled to just compensation for the alleged taking of their private property under the Takings Clause of the Fifth Amendment?  For the reasons discussed below, the court answers both questions in the negative.

### A.  Is the Conservation Security Program a Money-Mandating Source of Law under the Tucker Act?

#### 1.  Applicable Legal Framework

In order to establish subject matter jurisdiction in this court, plaintiffs must demonstrate that the government has consented to suit and that there is a substantive legal basis for their claims.  *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (*White Mountain Apache*) ("Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver.") (citations omitted).

Plaintiffs assert that the court may exercise subject matter jurisdiction over their claims under the Tucker Act, which provides in relevant part that the

> United States Court of Federal Claims shall have
> jurisdiction to render judgment upon any claim against
> the United States founded either upon the Constitution, or
> any Act of Congress or any regulation of an executive
> department, or upon any express or implied contract with
> the United States, or for liquidated or unliquidated
> damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).  The United States Court of Appeals for the Federal Circuit
has explained that the Tucker Act "does two things:  (1) it confers jurisdiction
upon the Court of Federal Claims over the specified categories of actions brought
against the United States, and (2) it waives the Government's sovereign immunity
for those actions."  *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005)
(*en banc* in relevant part).  However, the statute "does not create a substantive
cause of action; in order to come within the jurisdictional reach and the waiver of
the Tucker Act, a plaintiff must identify a separate source of substantive law that
creates the right to money damages."  *Id.*

Moreover, "[n]ot every claim invoking the Constitution, a federal statute, or
a regulation is cognizable under the Tucker Act."  *United States v. Mitchell*, 463
U.S. 206, 216 (1983).  On the contrary,

> [t]he claim must be one for money damages against the
> United States, *see United States v. King*, 395 U.S. 1, 2-3
> (1969), and the claimant must demonstrate that the
> source of substantive law he relies upon "can fairly be
> interpreted as mandating compensation by the Federal
> Government for the damages sustained."

*Id.* at 216-17 (quoting *United States v. Testan*, 424 U.S. 392, 400 (1976)) (footnote
and quotations omitted).  If the asserted legal basis of a claim does not mandate the
payment of money by the government, the court must dismiss the action because
"the absence of a money-mandating source [is] fatal to the court's jurisdiction
under the Tucker Act."  *Fisher*, 402 F.3d at 1173.

Plaintiffs expend a significant amount of time arguing that the CSP is an
"entitlement program," as if the mere application of that label to the program has
any independent legal significance in the context of establishing whether the

program is a money-mandating source.  Defendant, for its part, refers to the CSP as a "grant program," *see* Def.'s Mot. at 11, a "subsidy" program, *see id.* at 6, and an "incentive program," *see* Oral Argument Transcript (Tr.) at 6.  In determining whether the CSP statute is a money-mandating source of law, however, the court must examine the text of the statute and, if necessary, its legislative history, rather than the terms the parties use to describe the program.  *See Grav*, 886 F.2d at 1307 (noting that the starting point for the court's analysis of an allegedly money-mandating statute is the language of the statute).  The CSP statute itself does not use any of the terms used by the parties.  Therefore, plaintiffs' extensive reliance on various government definitions and reports related to so-called entitlement programs has little relevance to the court's analysis in this case.

In general, a statute will be deemed to be a money-mandating source of law if it compels the government to make a payment to an identified party or group. *See Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1009 (Ct. Cl. 1967) ("Under Section 1491 what one must always ask is whether the constitutional clause or the legislation which the claimant cites can be fairly interpreted as mandating compensation by the Federal Government for the damage sustained."). Under the "fair interpretation" standard, the asserted money-mandating source of law must be "reasonably amenable to the reading that it mandates a right of recovery in damages."  *White Mountain Apache*, 537 U.S. at 473.

The Federal Circuit has applied the fair interpretation standard in various factual circumstances and has held that when the government has no discretion to determine who is entitled to a payment under a statute, and has an absolute duty to make payments to any person or entity meeting the specific criteria set forth under the law, the statute is a money-mandating source.  *See Grav*, 886 F.2d at 1307 (holding that a statute was money mandating because it required the government to enter into a contract to pay money to any recipient who met the requirements of the statute and had no discretion to refuse to enter into such contracts).  In contrast, the Federal Circuit has also held that a source of law is not money mandating when the government enjoys complete discretion in determining who is, and who is not, entitled to a payment.  *See Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006) ("A statute is not money-mandating when it gives the government complete discretion over the decision whether or not to pay an individual or group.") (citing *Doe v. United States*, 100 F.3d 1576, 1582 (Fed. Cir. 1996)).  The court will refer to the legal rules covering these two divergent factual situations as the *Grav* rule and the *Doe* rule, respectively.

While some sources of law fall into one of the extreme categories described above, many statutes confer some limited degree of discretion upon the government in determining whether to make payments under the law.  When the government is endowed with discretion that is less than absolute, the appropriate standard for determining whether a source of law is money mandating is the standard articulated by the Federal Circuit in *Samish II*:

> The court has found Congress provided [for] damage remedies where the statutory text leaves the government no discretion over payment of claimed funds.  But Tucker Act jurisdiction is not limited to such narrow statutory entitlements.  Certain discretionary schemes also support claims within the Court of Federal Claims jurisdiction.  These include statutes:  (1) that provide "clear standards for paying" money to recipients; (2) that state the "precise amounts" that must be paid; or (3) as interpreted, compel payment on satisfaction of certain conditions.

*Samish II*, 419 F.3d at 1364 (citation omitted).  In short, if the court determines that a discretionary source of law meets one of the three requirements set forth above, that source will be deemed to meet the fair interpretation standard and is therefore money mandating for purposes of this court's jurisdiction under the Tucker Act.[7]

---

[7]/  Defendant also argues that the CSP statute is not money mandating because it does not compensate eligible producers for past injuries or labors.  The CSP, in defendant's view, is designed only to subsidize *future* conservation practices and thus cannot provide the jurisdictional basis for plaintiffs' suit in this court.  *See* Def.'s Mot. at 10-12.  In support of that argument, defendant relies upon the decision of the United States Supreme Court in *Bowen v. Massachusetts*, 487 U.S. 879 (1988), as applied by the Federal Circuit in *Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994), and by this court in *Black v. United States*, 56 Fed. Cl. 19 (2003) and *Malone v. United States*, 34 Fed. Cl. 257 (1995).  Defendant asserts that a statute cannot be money mandating unless it compensates claimants for damages or losses that were incurred in the past.  The court need not address whether that assertion is supported by *Bowen* or *Katz* because defendant has conceded that payments under the CSP are determined, at least in part, by the past performance of program participants.  *See* Tr. at 13-14 (explaining that the base payment component of the total annual payment under a conservation security contract is designed to compensate producers for "practices that the producer is already doing on their property").  Furthermore, plaintiffs allege that they have already adopted various conservation measures on their land, for which they are entitled to compensation under the CSP.  *See* Pls.' Resp. at 37-38,

continue...

In short, the general legal standard for determining whether a statute or regulation is money mandating is whether that statute or regulation may be fairly interpreted as mandating compensation by the government.  When the government enjoys absolute discretion over whether to make payments under the asserted source of law, the source does not meet the fair interpretation standard under *Doe* and is thus not money mandating.  On the opposite end of the spectrum, a source does meet the fair interpretation standard under *Grav* when it imposes an absolute duty upon the government to make payments to an identified class of beneficiaries and provides the government with no discretion in determining whether any particular member of that class is entitled to a payment.  Finally, a discretionary source of law is money mandating under *Samish II* when it provides a clear standard for the payment of money, states a precise amount of money to be paid, or compels the payment of money upon the satisfaction of certain conditions.

In assessing the money-mandating status of the CSP, the court must first determine whether the CSP statute and its implementing regulations fall into one of the two extreme categories of legal sources covered by the rules articulated by the Federal Circuit in *Grav* and *Doe*.  If the CSP is not governed by those two cases, then the court must analyze the program under the standard set forth in *Samish II*.

### 2.    Analysis of the CSP Statute and CSP Regulations under *Grav* and *Doe*

Under the rule set forth in *Doe*, a source of law is not money mandating when the government enjoys absolute discretion to refuse to make payments under that source.  Under the rule set forth in *Grav*, a source of law is money mandating when the government has no discretion at all to limit participation in a program or to deny payments under that program.  Defendant argues that the CSP statute and its implementing regulations afford "complete discretion" to the NRCS in determining eligibility for the CSP and, thus, in making payments under the CSP.  Plaintiffs, in contrast, assert that the CSP statute does not confer any such discretion upon the NRCS and relegates the agency to a ministerial role in the administration of the program.  The discretion contained in the CSP regulations,

---

[7]/ ...continue

App. F (asserting that plaintiffs have implemented a number of the conservation practices listed in the CSP statute).

according to plaintiffs, is foreclosed by the plain meaning of the CSP statute. Because the money-mandating status of the CSP statute and its implementing regulations under *Doe* and *Grav* turns on whether the statute and regulations provide the government with the requisite discretion to limit eligibility in the CSP, the court must undertake an analysis of their language, history and purpose.

> **a.** **The Language of the CSP Statute Is Ambiguous with Respect to Whether the NRCS May Adopt Additional Eligibility Requirements Not Expressly Set Forth in the Statute**

Plaintiffs assert that the language of the CSP statute precludes any discretion on the part of the agency in determining eligibility under the program. Defendant, in contrast, contends that the statute confers unlimited discretion upon the agency. Neither of those assertions is supported by the text of the statute. Both parties attach undue significance to isolated words and phrases in the CSP statute without viewing those terms within their broader context. As discussed below, the CSP statute is silent with respect to whether the NRCS may impose restrictive eligibility requirements in addition to those expressly set forth in the statute.

> **(i)** **Section 3838a(a) – In General**

Plaintiffs first argue that the language of section 3838a(a) is mandatory and precludes the exercise of discretion by the NRCS in determining which producers are eligible for the program. Defendant, on the other hand, argues that the exact same provision confers virtually unfettered discretion upon the NRCS in implementing the CSP. The disputed section provides that

> [t]he Secretary shall establish and, for each of fiscal years 2003 through 2011, carry out a conservation security program to assist producers of agricultural operations in promoting, as is applicable with respect to land to be enrolled in the program, conservation and improvement of the quality of soil, water, air, energy, plant and animal life, and any other conservation purposes, as determined by the Secretary.

16 U.S.C. § 3838a(a). The parties' competing interpretations of this section are

representative of their broader effort to find support for their respective positions in isolated words or phrases in the statute.  According to plaintiffs, use of the word "shall" denotes a mandatory entitlement program and the absence of discretion in its management.  However, the mandatory language contained in section 3838a(a) simply requires the NRCS to establish and administer the CSP for the purposes stated in that section.  This provision does not mention the criteria governing eligibility for the program and cannot be interpreted to require the NRCS to hold the program open to all producers who meet bare eligibility requirements set forth in the statute.

Defendant, on the other hand, places particular emphasis upon the phrase "as determined by the Secretary."  In defendant's view, that phrase confers virtually unlimited discretion upon the NRCS in determining whether a producer is eligible for the program.  Defendant argues that section 3838a(a) allows the NRCS to determine the purposes of the CSP and thus allows the agency to limit participation in the program to those producers and agricultural properties that will advance those purposes.  However, the discretion to add additional purposes to those listed in the statute does not necessarily entail the discretion to establish additional eligibility restrictions for the program.  In view of the varying interpretations of this provision, the court concludes that the language of section 3838a(a) provides no unassailably clear answer to the question of whether the NRCS may adopt additional eligibility criteria in addition to those expressly set forth in the CSP statute.[8]

### (ii)     Section 3838a(b)(1) – Eligible Producers

Plaintiffs next argue that the CSP is money mandating because any producer who meets the specific requirements set forth in section 3838a(b)(1) is entitled to

---

[8]/  Defendant asserts that the phrase, "as determined by the Secretary," is separated from the preceding clause by a comma and should therefore be read to modify the entire section of the statute.  *See* Def.'s Reply at 4.  However, such a construction would essentially negate what defendant has acknowledged is a mandatory command to establish and administer the CSP during the stated fiscal years.  Plaintiffs, in contrast, contend that the phrase "simply empowered the Secretary to add other conservation *activities* to the specified list for which the statute entitled eligible producers to payment."  Pls.' Resp. at 15 (emphasis added).  While section 3838a(a) discusses the conservation *purposes* of the CSP, it does not address – nor even mention – the range of permissible conservation *activities* under the program.  Thus, it is not at all clear how plaintiffs derived their proposed interpretation of that provision.

receive payments under the program.  The referenced section sets forth two eligibility requirements applicable to agricultural producers who seek to enroll in the CSP:

> To be eligible to participate in the conservation security program (other than to receive technical assistance under section 3838c(g) of this title for the development of conservation security contracts), a producer shall –
>
> (A)     develop and submit to the Secretary, and obtain the approval of the Secretary of, a plan that meets the requirements of subsection (c)(1) of this section; and
>
> (B)     enter into a conservation security contract with the Secretary to carry out the conservation security plan.

16 U.S.C. § 3838a(b)(1).

By using mandatory language, Congress imposed the requirements set forth in section 3838a(b)(1) as necessary conditions that must be fulfilled by producers prior to enrollment in the CSP.  While section 3838a(b)(1) directs producers to provide conservation security plans that meet the "requirements" of section 3838a(c)(1), even a cursory review of that section reveals that no substantive requirements were contained therein – only directions to identify the land, and provide a description of the proposed practices, as well as a schedule.  Nothing in section 3838a(b)(1), moreover, prohibits the adoption of additional eligibility requirements by the NRCS.  While that section provides that producers "shall" meet the requirements of this section as a prerequisite to participation in the CSP, it does not require automatic acceptance into the program of any and all producers who meet those minimal requirements.  In fact, the virtual absence of any substantive requirements for conservation security plans in the statute strongly suggests that Congress contemplated the promulgation of such requirements by the NRCS.  In short, section 3838a(b)(1) is silent with respect to whether the NRCS may impose eligibility requirements in addition to those listed in that section.

### (iii)     Section 3838a(b)(2) – Eligible Land

Plaintiffs next argue that the watershed approach adopted by the NRCS is

21

inconsistent with the clear language of section 3838a(b)(2), which provides that "private agricultural land (including cropland, grassland, prairie land, improved pasture land, and rangeland), land under the jurisdiction of an Indian tribe (as defined by the Secretary), and forested land that is an incidental part of an agricultural operation shall be eligible for enrollment in the conservation security program." 16 U.S.C. § 3838a(b)(2). Plaintiffs argue that section 3838a(b)(2) precludes the use of any eligibility requirement based on location or geography. However, that section merely states that certain broad categories of land are *eligible* for enrollment in the CSP. It does not prescribe that all such land shall be enrolled. The language of that section does not serve to divest the agency of the right or responsibility to promulgate regulations with specific requirements, which may result in the exclusion from participation of some properties that may have been otherwise eligible under the statute. Thus, this provision is also silent with respect to the precise question at issue.

### (iv)    Section 3838a(d)(1)(A) – Establishment of Tiers

Both plaintiffs and defendant seek support for their respective positions in section 3838a(d)(1)(A), which provides that the NRCS "shall establish, and offer to eligible producers, 3 tiers of conservation contracts under which a payment under this subpart may be received." 16 U.S.C. § 3838a(d)(1)(A). While plaintiffs believe this section requires the NRCS to enter into a contract with every producer who meets the broad requirements set forth in the statute, *see* Pls.' Resp. at 9 ("The CSP statute afforded the Secretary no discretion to refuse to enter into a contract with producers, like plaintiffs, who met all of the requisite eligibility criteria for the program set out in the statute."), defendant argues that the use of the word "may" in that section underscores the discretionary nature of the program.

The court concludes that this section merely provides that three separate tiers of conservation security contracts must be made available under the program. Under section 3838a(d)(1)(A), the NRCS is directed to offer three levels of contracts to producers to be enrolled in the CSP. The mandatory language employed in that section would prevent the NRCS from adopting fewer than, or more than, three tiers of conservation security contracts. But that language cannot be read to mandate that the government enter into a contract with any producer who meets the minimal requirements set forth in the statute. The general parameters for each of the three contract tiers is described in section 3838a(d)(5), and is subject to the significant caveat that the "minimum requirements for each

tier of conservation contracts implemented under paragraph (5) shall be determined and approved by the Secretary." 16 U.S.C. § 3838a(d)(6).  As discussed above, the government is not required to enter into a conservation security contract with a producer until it has approved a conservation security plan submitted by that producer, and the approval of such a plan lies within the discretion of the NRCS.

Likewise, the alternative interpretation of section 3838a(d)(1) urged by defendant strains credulity.  Defendant reads that section to provide the NRCS with complete discretion in determining whether to make payments under its conservation security contracts.  However, the discretionary term "may" is used in connection with the receipt of a payment by a producer, not with the payment of money by the government.  In that context, the use of this term does nothing more than indicate the manner in which any payment due and owing may be received (*i.e.*, under one of three types of contracts).  Section 3838a(d)(1) provides no guidance with respect to whether the NRCS may limit participation in the CSP by adopting restrictive eligibility criteria in addition to those set forth in the statute.

### (v)   Section 3838a(e) – Conservation Security Contracts

Plaintiffs argue that section 3838a(e) requires the NRCS to enter into a conservation security contract with any producer who meets the basic eligibility criteria set forth in the CSP statute.  This section of the CSP statute provides that upon "approval of a conservation security plan of a producer, the Secretary shall enter into a conservation security contract with the producer to enroll the land covered by the conservation security plan in the conservation security program." 16 U.S.C. § 3838a(e)(1).  While the language of section 3838a(e)(1) is indeed mandatory, it is subject to an important condition precedent:  the prior approval of a conservation security plan by the NRCS.

Admittedly, once the NRCS has approved a conservation security plan, it has no choice but to enter into a conservation security contract for the purpose of implementing the approved plan.  In that sense, plaintiffs are correct in their assertion that the act of entering into a conservation security contract is a merely ministerial act on the part of the NRCS.  However, the NRCS enjoys substantial discretion in deciding whether to approve or deny an individual conservation security plan, which is a predicate to the issuance of any contract.  Because the CSP statute provides virtually no substantive requirements for such plans, the most

reasonable interpretation of the statute is one that provides the NRCS with the discretion to establish such requirements. Furthermore, the ability to create minimum requirements for conservation security plans, in turn, effectively allows the NRCS to establish minimum requirements for conservation security contracts because the contents of those two documents must be consistent with one another. *See* 16 U.S.C. § 3838a(b)(1)(B) (requiring that a conservation security contract must "carry out" an approved conservation security plan). In addition, the CSP statute expressly provides the NRCS with the discretion to establish the minimum requirements for each of the three contract tiers. In short, section 3838a(e) cannot reasonably be interpreted to require the NRCS to accept into the CSP all producers who meet the bare requirements of the statute.

### (vi)   Section 3838c(a) – Timing of Payments

Plaintiffs further argue that the CSP statute requires the NRCS to make payments to all producers who meet the requirements set forth in the statute because the statute requires the government to make payments under the program "as soon as practicable after October 1 of each fiscal year." 16 U.S.C. § 3838c(a). However, as indicated by the subheading of the section referenced by plaintiffs ("Timing of Payments"), that provision does not confer any substantive entitlement to payments under the CSP statute; on the contrary, it merely establishes the time at which any required payments must be made. Unless plaintiffs are able to establish an entitlement to payments under the CSP, section 3838c(a) has no independent applicability in the present case.

### (vii)   Section 3838c(g) – Technical Assistance

Defendant asserts that the cap on technical assistance, which essentially limits annual expenditures for the administration of the CSP to no more than fifteen percent of total annual expenditures on the program, indicates that Congress intended to provide the NRCS with the discretion to limit eligibility for the CSP in order to remain within that funding constraint. *See* 16 U.S.C. § 3838c(g). While plaintiffs acknowledge that the fifteen-percent cap on technical assistance expenditures was a significant impediment to the full implementation of the CSP, they nonetheless argue that the limitation cannot reasonably be read to confer upon the NRCS the discretion to limit eligibility in the program based on additional requirements not contained in the text of the statute. It is clear that the fifteen-percent cap was one of the principal reasons that the NRCS limited the number of

producers allowed to participate in the program.  However, the court agrees with plaintiffs that section 3838c(g) is silent with respect to whether that provision provided the NRCS with the discretion to do so.

Based on its analysis of the CSP statute as a whole, the court holds that the express language of the statute does not clearly endow the NRCS with discretion to adopt eligibility requirements not contained in the statute, nor does the statute clearly foreclose the exercise of such discretion.  Because the CSP statute is itself silent or ambiguous with respect to the precise question at issue, the court will examine the legislative history of the statute in order to discern congressional intent in this regard.

> **b.      The Legislative History of the CSP Statute Is Ambiguous with Respect to Whether the NRCS May Adopt Additional Eligibility Requirements Not Expressly Set Forth in the Statute**

The legislative history of the CSP statute provides little specific insight into whether Congress intended to endow the NRCS with discretion to limit participation in the program based on eligibility requirements not contained in the statute.  To be sure, there are statements in the conference report which appear to suggest that the program would be held open to all applicants who satisfied the broadly stated minimal requirements set forth in the CSP statute.  For example, the report states that "[t]he CSP, which is open to all producers for maintaining or adopting practices on private agricultural land, will be established from fiscal years 2003 through 2007."  Conference Report, Farm Security and Rural Investment Act of 2002 (CSP Report), H.R. Rep. No. 107-424, at 477-78 (2002) (Conf. Rep.), *as reprinted in* 2002 U.S.C.C.A.N. 141, 202.  Similarly, the report states that "[t]he Managers intend that the Secretary will not employ an environmental bidding or ranking system in implementing CSP and . . . should approve a producer's contract that meets the standards of the program."  CSP Report at 478, *as reprinted in* 2002 U.S.C.C.A.N. at 203.  Finally, the report notes that "[t]he Managers expect the Secretary to implement the CSP in a manner that will allow all agricultural producers, including fruit and vegetable producers and livestock producers, to participate equitably in the program."  CSP Report at 478-79, *as reprinted in* 2002 U.S.C.C.A.N. at 203.

However, the conference report also contains language which might be

interpreted to endorse precisely the types of eligibility determinations and staged implementation of the program that plaintiffs claim are incompatible with the statute.  For example, the report states that "[t]he Managers expect the Secretary to implement the CSP to encourage the *widest participation possible at a level that ensures resources are protected at a non-degradation level.*"  CSP Report at 477, *as reprinted in* 2002 U.S.C.C.A.N. at 202 (emphasis added).  In other words, that language might be read to suggest that the NRCS may limit the number of participants in the program when such a restriction is necessary to ensure the protection of resources on the land to be enrolled.  For example, plaintiffs have argued that full participation in the CSP in FY2004 would have limited the average payment under the program to approximately $23 due to the spending limitations imposed by Congress.  PPFUF ¶ 45.  Similarly, the average payments in FY2005 and FY2006 would have been $112 and $144, respectively, in light of the spending limitations in place during those years.  *Id.* ¶¶ 48, 51.  There is no question that the *de minimis* payments that would have been available under full participation would have been insufficient to ensure the protection of natural resources on many of the enrolled properties.

Moreover, some of the statements that initially appear to buttress plaintiffs' interpretation of the statute are not as persuasive as they first appear.  For example, the conference report states that the NRCS "should approve a producer's *contract* that meets the standards of the program."  CSP Report at 478, *as reprinted in* 2002 U.S.C.C.A.N. at 203 (emphasis added).  First, as noted above, the approval of a conservation security contract is virtually automatic upon the approval of a conservation security plan.  But the quoted statement from the report does not provide that the NRCS must approve a conservation security *plan* that meets the bare standards of the statute.  In addition, the report states that the NRCS should approve such contracts when they meet the standards of the *program*.  While plaintiffs assert that the term CSP (referring to a functioning government program) is coextensive with the CSP statute, the statute simply provides the NRCS with the authority to establish the CSP and outlines the broad contours of the program.  *See* 16 U.S.C. § 3838a(a).  In other words, the "program" referenced in the conference report must be understood to include both the CSP statute as well as the implementing regulations adopted by the NRCS.[9]  There is no question that

---

[9]/  This interpretation of the term "conservation security program" is supported by the CSP statute, which defines that term not as the statute itself, but as "the program established

continue...

plaintiffs fail to meet the eligibility requirements for the program established by the CSP regulations.

Finally, the conference report does not state that the NRCS is *required* to approve all conservation security contracts that meet the standards of the program. Rather, the report merely provides that the NRCS "should" approve such contracts. The use of such hortatory language does not support plaintiffs' reading of the CSP statute. In short, the legislative history of the CSP statute does not clearly support either party's extreme interpretation of the statute.

The court has thus determined that neither the language nor the legislative history of the CSP statute provides a clear answer as to whether the statute authorized or was intended to authorize the agency's adoption of additional eligibility criteria not set forth in the statute. Accordingly, the court now turns to the question of whether the CSP regulations provided the NRCS with authority to impose the disputed eligibility requirements not contained in the express language of the statute.

   **c.    The Implementing Regulations Authorize the NRCS to Limit Eligibility for the CSP and Impose Eligibility Requirements Not Contained in the CSP Statute**

Plaintiffs were excluded from participation in the CSP based upon their failure to meet an eligibility requirement that was set forth in the CSP regulations, but which was not expressed in the CSP statute. Various provisions of the implementing regulations demonstrate that those regulations endow the NRCS

---

[9]/ ...continue

under section 3838a(a) of this title." 16 U.S.C. § 3838(6). When the CSP is properly viewed as both the CSP statute and its implementing regulations, it becomes apparent that the various definitions of the term "entitlement" referenced by plaintiffs do not support their argument that the NRCS is required to make payments to anybody who meets the bare requirements set forth in the statute. As plaintiffs note, the General Accounting Office (now the Government Accountability Office) defines an entitlement as a benefit under a government program that "requires the payment of that benefit (or entitlement) to any person that meets the eligibility requirements established *by law*." Pls.' Resp. at 8 (quoting General Accounting Office, A Glossary of Terms Used in the Federal Budget Process 57 (3d ed. 1981)) (emphasis added). Unless the court were to hold that the implementing regulations were invalid, the "law" must be viewed to include both the CSP statute and its implementing regulations.

with discretion to impose requirements not contained in the CSP statute.  First, the regulations provide that each annual sign-up notice will provide specific information about the properties that will be eligible to participate, as well as "[a]ny additional program eligibility criteria that are not listed in § 1469.5."  7 C.F.R. § 1469.6(c)(1)(i).  In other words, the CSP regulations do not merely adopt eligibility requirements that were not expressly set forth in the statute; they also authorize the agency to adopt requirements that are not expressly set forth in the regulations.  In addition, the regulations provide that the NRCS is authorized to "modify or waive a provision of this part if the [NRCS] determines that the application of such provision to a particular limited situation is inappropriate and inconsistent with the goals of the program."  7 C.F.R. § 1469.2(b).  In authorizing the NRCS to modify any of the program's provisions, the CSP regulations further effectively allow the agency to establish additional eligibility requirements not contained in the CSP statute or the regulations.

While there is no question that the CSP regulations contain eligibility requirements that were not contained in the CSP statute, the parties disagree with respect to whether the adoption of those requirements was authorized and consistent with the CSP statute.  The implementing regulations are based upon an interpretation of the CSP statute that endows the NRCS with the discretion to limit eligibility for the CSP.  In order to determine the validity of the CSP regulations, the court must first determine whether the agency's interpretation of the statute, as set forth in its regulations, is entitled to deference.

> **d.   The Agency's Interpretation of the CSP Statute, as Embodied in the Implementing Regulations, Is Entitled to Judicial Deference**

The government asserts that the CSP statute confers discretion upon the agency to determine eligibility for the CSP.  Plaintiffs, in contrast, contend that the statute precludes the exercise of such discretion.  As discussed above, the language of the statute and its legislative history are ambiguous with respect to whether the NRCS possesses discretion to establish eligibility requirements not expressly set forth in the statute.  As stated, the NRCS has codified its interpretation of the CSP statute in its implementing regulations.  For the reasons discussed below, the court holds that the agency's interpretation of the CSP statute is entitled to deference.

When an agency interprets language contained in a statute it is charged with

implementing, a reviewing court must choose among various levels of judicial deference.  In general, the degree of deference to be afforded to such interpretations depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140.  Simply stated, courts are generally required to defer to such interpretations only to the degree that they find them persuasive.

However, administrative interpretations of ambiguous statutory language are entitled to a heightened level of deference "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."  *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).  In those circumstances, judicial review of an agency interpretation of ambiguous statutory language is governed by the two-part inquiry articulated by the Supreme Court in *Chevron*:

> First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation.  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. at 842-43.

In order to determine whether the interpretation of the CSP statute adopted by the NRCS in its regulations is entitled to deference, the court must first answer two threshold questions:  did Congress delegate to the NRCS the authority to adopt regulations with the force of law, and was the NRCS's interpretation of the CSP statute promulgated pursuant to that authority?  If the court answers those

preliminary questions in the affirmative, it must then proceed to the two-part analysis set forth in *Chevron*. First, does the CSP statute directly address whether the NRCS has the discretion to further limit eligibility for the program? And second, was the interpretation adopted by the NRCS reasonable? For the reasons discussed below, the interpretation of the CSP statute embodied in the regulations – *i.e.*, that the NRCS has discretion under the statute to develop additional eligibility requirements for the program – is entitled to deference under *Chevron*.

> ### (i) The CSP Statute Authorized the NRCS to Promulgate Regulations to Implement the CSP

In order to qualify for the level of deference contemplated under *Chevron*, an interpretation of statutory language must have been promulgated pursuant to an express or implied delegation of authority from Congress to adopt regulations carrying the force of law. The Supreme Court has held that the "[d]elegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." *Mead*, 533 U.S. at 227.

The court must first determine whether Congress delegated to the NRCS the authority to promulgate administrative regulations that have the force of law. Plaintiffs argue that the CSP statute does not delegate such authority to the NRCS. Rather, they assert that "Congress expressly directed the Secretary to promulgate regulations in only one place, 16 U.S.C. § 3838a(d)." Pls.' Suppl. Br. at 6 n.11.[10] Section 3838c(d), captioned "Regulations," requires the NRCS to promulgate regulations to protect the interests of tenants and sharecroppers and to ensure a fair and reasonable application of the general payment criteria set forth in the statute. *See* 16 U.S.C. § 3838c(d). Because they assume that limits on eligibility are beyond the scope of the regulations contemplated by that section, plaintiffs essentially argue that the implementing regulations adopted by the NRCS were *ultra vires*.

Plaintiffs' assertion is problematic for a number of reasons. First, while section 3838c(d) requires the NRCS to adopt regulations for the stated purposes

---

[10]/ Because it is apparent that plaintiffs intended to cite section 3838c(d) instead of section 3838a(d), future references to this provision and plaintiffs' arguments regarding this provision will refer to section 3838c(d).

outlined therein, it does not preclude the adoption of regulations that are designed to achieve other objectives set forth in the statute. Second, plaintiffs are simply incorrect in their assertion that section 3838c(d) is the only provision in the CSP statute that grants the NRCS authority to promulgate implementing regulations. The 2002 Farm Bill included the following provision: "Not later than 270 days after the date of enactment of this Act, the Secretary of Agriculture shall promulgate regulations implementing the amendment made by subsection (a)." 116 Stat. 233. The entire CSP statute was contained within that referenced subsection of the 2002 Farm Bill. Thus, the CSP statute contained an express delegation of rulemaking authority specifically empowering the agency to adopt regulations necessary to implement the CSP statute.

In addition to that express delegation of authority, section 3838a(a) provides an implied delegation of such authority by directing the NRCS to "establish" and "carry out" the CSP. *See* 16 U.S.C. § 3838a(a). Even if the CSP statute lacked an express delegation of rulemaking authority to the NRCS – which it does not – the implied delegation of such authority contained in section 3838a(a) would be sufficient to meet the first threshold inquiry of the *Chevron* analysis. *See Mead*, 533 U.S. at 227 ("Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, *or by some other indication of a comparable congressional intent*.") (emphasis added); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) ("Deference under *Chevron* to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps.") (citation omitted). Plaintiffs' assertion that the NRCS lacked the general authority to adopt implementing regulations for the CSP is therefore without merit.

Next, the court must determine whether the interpretation of the CSP statute advanced by the NRCS via regulation was adopted pursuant to the delegation of rulemaking authority under the statute. The court concludes that it was. The NRCS has adopted CSP eligibility requirements in its implementing regulations. The NRCS explained that its adoption of new eligibility requirements was based upon its interpretation of the express language of the CSP statute: "The authority for the use of priority watersheds and enrollment categories is the authority to determine the conservation purposes for which assistance for conservation and improvement are to be provided under CSP – 16 U.S.C. [§] 3838[a](a)." 69 Fed.

31

Reg. at 34504. Because the NRCS adopted its interpretation of the CSP statute pursuant to a delegation of general rulemaking authority from Congress, the degree of deference to which that interpretation is entitled must be determined under the framework set forth in *Chevron*. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("Of course, the framework of deference set forth in *Chevron* does apply to an agency interpretation contained in a regulation."); *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1321 (Fed. Cir. 2003) ("Where, as here, an agency has adopted a regulation by notice-and-comment rulemaking, the *Chevron* standard of deference applies to that regulation.").

> **(ii)** **The CSP Statute Does Not Address the Precise Question at Issue**

Because the NRCS's interpretation of the CSP statute is embodied in regulations that were authorized under the statute and promulgated in accordance with the requirements of notice-and-comment rulemaking, the court must review that interpretation under the analytical framework supplied by *Chevron*. Under the first step of that analysis, the court must determine whether the CSP statute directly addresses the precise question at issue, *i.e.*, whether the NRCS has the discretion to impose additional eligibility requirements for participation in the program in addition to those set forth in the statute. The CSP statute is silent with respect to whether the NRCS has the discretion to adopt eligibility criteria not contained in the statute, and the legislative history of the statute provides no conclusive answer to that question. Because the CSP statute does not address the precise question at issue, the court must proceed to the second step of the *Chevron* analysis to determine whether the agency's interpretation of the statute, as embodied in the CSP regulations, is based upon a permissible construction of the statute.

> **(iii)** **The NRCS's Interpretation of the CSP Statute, as Embodied in the Implementing Regulations, Is Reasonable**

Under *Chevron*, the court must defer to the interpretation of the CSP statute adopted by the NRCS in its regulations as long as that interpretation is reasonable. Here, the government's interpretation of the CSP statute is not mandated by the text of the statute, nor is the alternative interpretation proposed by plaintiffs foreclosed by the statute. However, the interpretation embodied in the CSP regulations does not have to be the only plausible reading of the statute, nor does it

have to be the most persuasive construction of its language.  As long as the agency's interpretation of the statute is reasonable, it is entitled to judicial deference.  *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 395 (2008) ("[W]hen an agency invokes its authority to issue regulations, which then interpret ambiguous statutory terms, the courts defer to its reasonable interpretations."); *Chevron*, 467 U.S. at 844 (holding that agency interpretations embodied in regulations are "given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute"); *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1360-61 (Fed. Cir. 2007) ("Thus, a court must defer to an agency's reasonable interpretation of a statute and must not substitute its own judgment for that of the agency even if the court might have preferred another interpretation and even if the agency's interpretation is not the only reasonable one.").

The court holds that the interpretation of the CSP statute advanced by the NRCS is reasonable, and that the CSP regulations were authorized and consistent with the statute.  First, the express language of the CSP statute does not proscribe the adoption of additional eligibility requirements by the NRCS.  In addition, it is apparent that the CSP statute contains far too many gaps to be administered in the absence of implementing regulations.  The statute provides a general framework for the CSP, but directs the NRCS to "establish" that program.  Finally, the legislative history of the statute is consistent with an interpretation that authorizes the agency to limit participation in the program.  The conference report, for example, directs the NRCS to implement the CSP "at the full national level *as soon as practicable*."  CSP Report at 479, *as reprinted in* 2002 U.S.C.C.A.N. at 203 (emphasis added).  Likewise, the report instructs the NRCS to "implement the CSP to encourage *the widest participation possible at a level that ensures resources are protected at a non-degradation level*."  CSP Report at 477, *as reprinted in* 2002 U.S.C.C.A.N. at 202 (emphasis added).  The interpretation of the CSP statute proposed by the NRCS – *i.e.*, that the agency has the discretion to limit eligibility in the program – is not unreasonable.[11]

---

[11]/ Because the court holds that the NRCS's interpretation of the CSP statute, as to the agency's discretion to impose eligibility requirements, is reasonable, that interpretation is entitled to *Chevron* deference.  The court need not address the separate issue of whether the watershed approach adopted by the agency in the exercise of that discretion is also reasonable.  Here, the question that plaintiffs raised was whether the NRCS possessed authority to issue regulations imposing new eligibility requirements above and beyond those contained in the

continue...

Neither the express language nor the legislative history of the CSP statute addresses whether the NRCS possesses any discretion to limit participation in the program by imposing new eligibility requirements in addition to those set forth in the statute.  In its implementing regulations, however, the NRCS has adopted an interpretation of the statute that endows the agency with such discretion, and the court, as discussed above, has concluded that the agency's interpretation of the statute is reasonable and therefore entitled to judicial deference.  Because the CSP – viewed as both the CSP statute and its implementing regulations – provides the government with the requisite discretion to limit participation in the program, it is not money mandating under the test set forth in *Grav*.  For that reason, the money-mandating status of the CSP must be determined pursuant to *Samish II*.[12]

---

[11]/  ...continue
statute – a query that this court has answered in the affirmative.  Plaintiffs' challenge in this case was not directed specifically at the reasonableness of the geographic focus articulated by the watershed requirements.  However, to the extent that such a challenge has been raised in this case, that challenge to the reasonableness or substantive rationality of the watershed approach would have been properly brought in a suit for injunctive relief pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (2006), a claim over which this court does not have jurisdiction.  *See Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1370 n.11 ("Of course, no APA review is available in the Court of Federal Claims.").

[12]/  In support of their argument that the CSP statute is a money-mandating source of law, plaintiffs emphasize a number of similarities between the CSP and the Milk Diversion Program (MDP) created by the Dairy Production Stabilization Act of 1983, Pub. L. No. 98-180, tit. I, 97 Stat. 1128 (codified at 7 U.S.C. § 1446(d)(3) (Supp. I 1983), and repealed by the 1985 Farm Bill, tit. I, § 101(b)) (MDP statute), which the Federal Circuit determined was money mandating in *Grav*.  Despite the superficial similarities noted by plaintiffs, the court finds that the two programs are distinguishable on the facts.  For example, the MDP statute employed absolute language that required the USDA to enter into a milk diversion contract with "any producer of milk in the United States" who agreed to reduce their milk production.  *See* 97 Stat. 1129-30.  Furthermore, the MDP statute stated a precise amount of money to be paid to participants in the program, requiring the USDA to pay ten dollars for each 100-pound reduction in the amount of milk marketed during the fifteen-month period in which the program was in effect.  *See id.* at 1130-31.  Thus, the CSP statute is fundamentally different from the MDP statute in the degree of discretion conferred upon the implementing agency.

### 3.     Analysis of the Conservation Security Program under *Samish II*

In *Samish II*, the Federal Circuit held that the existence of discretion in a statute will not preclude jurisdiction in this court when the statute provides clear standards for the payment of money, states the precise amount to be paid, or compels the payment of money upon the satisfaction of certain conditions.  *See* 419 F.3d at 1364.  Plaintiffs assert that this court has jurisdiction over their claims because the CSP statute meets the requirements of *Samish II*.  However, because the court has held that under *Chevron* the CSP regulations were both authorized and consistent with the CSP statute, the court must review the statute and its implementing regulations in tandem to determine whether the combination of both constitutes a money-mandating source of law.  *See Kennedy Heights Apartments, Ltd. v. United States*, 48 Fed. Cl. 574, 579 (2001) (noting that when "a statute allows discretion concerning the payment of money, but a regulation enacted to give effect to the statute mandates such payment, then the combination of the two is considered money-mandating") (citation omitted).

As a threshold issue, plaintiffs argue that the analysis of the CSP statute under *Samish II* is inappropriate and instead suggest that the court should review the CSP statute under an alternative standard set forth in *Greenlee County, Ariz. v. United States*, 487 F.3d 871, 875-77 (Fed. Cir. 2007) (*Greenlee County*).  Plaintiffs' suggestion is misplaced for two reasons.  First, *Greenlee County* does not articulate a new or different standard for determining whether a statute is money mandating.  On the contrary, the Federal Circuit applied the general rule that a statute is money mandating when it can be fairly interpreted as mandating compensation by the government.  487 F.3d at 875-76.  Plaintiffs argue that *Greenlee County* stands for the proposition that a statute is money mandating when the plaintiff establishes that it is within the class of plaintiffs entitled to recover under the statute.  *See* Pls.' Resp. at 6-7.  The standard referenced by plaintiffs, however, is not an alternative test for determining whether a statute is money mandating; rather, that rule simply delineates the burden that a plaintiff must meet in order to survive a motion to dismiss under RCFC 12(b)(1).[13]  In addition,

---

[13]/ In *Greenlee County*, the Federal Circuit addressed whether the failure to demonstrate an entitlement to payments under a money-mandating statute warrants dismissal under RCFC 12(b)(6) for failure to state a claim or pursuant to RCFC 12(b)(1) for lack of subject matter

continue...

*Samish II* is the proper framework for determining the money-mandating status of the CSP because the court has held that the CSP provides the NRCS with the discretion to limit participation in the program. For the reasons discussed below, the court concludes that the CSP statute and its regulations, when viewed together, do not meet the requirements of *Samish II*.

> **(a)     The CSP Statute and Its Implementing Regulations Do Not Provide a Clear Standard for the Payment of Money, Nor Do They State a Precise Amount to Be Paid**

Plaintiffs assert that the CSP statute meets the requirements of *Samish II* because the statute provides clear standards for the payment of money and includes clear formulas that enable the calculation of the precise amount of money that must be paid. The court disagrees. Both the CSP statute and its implementing regulations provide substantial discretion to the NRCS in calculating the payments to which a program participant may be entitled under a conservation security contract.

> **(i)     Adjusted Base Payments**

As discussed above, the CSP statute provides that a payment under a CSP contract is composed of three components and establishes upper limits for one of those components as well as for the total payment. Plaintiffs claim that the CSP statute meets the first two prongs of the *Samish II* analysis because it establishes a clear standard for the payment of money and allows annual payments to be calculated with precision. However, as discussed below, the CSP statute and its regulations confer substantial discretion upon the NRCS in setting payment amounts under conservation security contracts.

---

[13]/ ...continue
jurisdiction. Based on its *en banc* holding in *Fisher*, the Federal Circuit concluded that an inability to demonstrate an entitlement to damages on the merits does not warrant dismissal for lack of subject matter jurisdiction; rather, such cases should be dismissed for failure to state a claim. 487 F.3d at 875-77. In order to survive a motion to dismiss under RCFC 12(b)(1), the plaintiff must cite a money-mandating source of law *and* make a nonfrivolous assertion that it is within the class of plaintiffs entitled to recover under that source.

The CSP statute provides that the adjusted base payment component of the total annual payment under a conservation security contract is equal to a specified percentage of the "the average national per-acre rental rate for a specific land use during the 2001 crop year." 16 U.S.C. § 3838c(b)(1)(A)(i). While that appears to establish an ascertainable rate for the adjusted base payment, the statute further provides that the NRCS may instead adopt "another appropriate rate for the 2001 crop year that ensures regional equity." *Id.* § 3838c(b)(1)(A)(ii). In other words, the government is endowed with some level of discretion in setting adjusted base payments under the CSP statute, which cannot be interpreted as establishing a precise amount of money to be paid to recipients.[14]

In some ways, the CSP regulations constrain the discretion of the NRCS to a greater degree than the CSP statute. For example, the statute allows the NRCS to choose between the default rate for base payments and virtually any other rate the NRCS believed would ensure regional equity. The implementing regulations, in contrast, set forth a general methodology to be used in calculating the adjusted base payment component (also referred to as a "stewardship payment" under the regulations) of the total annual payment under a conservation security contract. *See* 7 C.F.R. § 1469.23(a). In committing to an identified methodology for calculating adjusted base payments, the NRCS has thus established some minimal limits on its own discretion to set those rates.

However, the degree of discretion conferred upon the NRCS under the regulations in determining adjusted base payments compels the court to hold that the CSP does not meet the first two prongs of the *Samish II* inquiry. For example, the regulations allow the agency to adjust the county-level base rates to ensure local and regional equity and consistency. *See id.* § 1469.23(a)(2)(ii). And while the regulations establish a general methodology for calculating adjusted base payments, the actual rates and payments are not set forth in the regulations, but are instead determined by the NRCS on an annual basis and published each year in the

---

[14]/ Without more, the text of the CSP statute appears to confer nearly absolute discretion upon the NRCS in setting base payments. However, the conference report for the 2002 Farm Bill provides that "[i]n applying another appropriate rate to ensure regional equity, the Secretary shall not provide a rate lower than the national average rental rate." CSP Report at 478, *as reprinted in* 2002 U.S.C.C.A.N. at 203. In light of that legislative history, it appears that Congress intended to limit the discretion of the NRCS to set an alternative rate for base payments to rates that are higher than the default rate set forth in the statute.

annual sign-up notice. *See id.* § 1469.23(a)(6). Finally, the adjusted base payment is just one component of the total annual payment, and, as discussed below, the NRCS enjoys near-absolute discretion in determining the other two components of the annual payment.

### (ii)     Cost-Sharing Payments

As discussed above, the NRCS enjoys substantial discretion in setting the adjusted base rate component of the total annual payment under a conservation security contract. The agency is endowed with even greater discretion in determining the cost-sharing component of the annual payment. The CSP statute provides that the cost-sharing component of the total annual payment shall be equal to "[a]n amount that does not exceed 75 percent (or, in the case of a beginning farmer or rancher, 90 percent) of the average county costs of practices for the 2001 crop year that are included in the conservation security contract, as determined by the Secretary . . . ." 16 U.S.C. §§ 3838c(b)(1)(C)(ii), 3838c(b)(1)(D)(ii), 3838c(b)(1)(E)(ii). While the CSP statute provides that the cost-sharing component of the annual payment may not exceed seventy-five percent of the average cost of the conservation practices adopted, nothing in the statute would prevent the NRCS from establishing a substantially lower reimbursement rate. Thus, the CSP statute sets an upper limit for cost-sharing payments, but it does not provide an exact reimbursement rate or a formula for the calculation of that rate.

Similarly, the CSP regulations also confer substantial discretion upon the NRCS in determining the cost-sharing component of the annual payment. Much like their counterparts in the CSP statute, the sections of the CSP regulations governing the calculation of the annual payments provide nearly unlimited discretion to the NRCS. For example, the CSP regulations provide the NRCS with the discretion to determine which practices will be eligible for a cost-share payment. *See* 7 C.F.R. §§ 1469.23(b)(1), 1469.23(c)(1). In addition, the regulations provide that the NRCS may reimburse producers for an unspecified percentage of the costs of implementing or maintaining such practices, but note that the actual reimbursement rate will be determined by the NRCS and announced each year in the annual sign-up notice. *See id.* §§ 1469.23(b)(2), 1469.23(c)(2). Finally, the regulations further state that the NRCS is free to reduce the applicable reimbursement rates for a cost-sharing payment in any given sign-up notice. *See id.* §§ 1469.23(b)(7), 1469.23(c)(8).

### (iii)   Enhanced Payments

The third component of the total annual payment is the enhanced payment, which is almost entirely within the exclusive discretion of the NRCS.  Under the CSP statute, the precise amount of such payments are "determined by the Secretary in a manner that ensures equity across regions of the United States . . . ."  *See* 16 U.S.C. §§ 3838c(b)(1)(C)(iii), 3838c(b)(1)(D)(iii), 3838c(b)(1)(E)(iii).  That formulation is virtually identical to the alternative standard for base payments that may be adopted by the NRCS under the statute.  Thus, the NRCS enjoys virtually unlimited discretion in setting enhanced payments under the CSP statute, and that discretion is nowhere constrained by the CSP regulations.  For example, the regulations confer discretion upon the NRCS to determine which practices will be eligible for such payments.  *See* 7 C.F.R. § 1469.23(d)(1).  The regulations further state that the eligible practices and the applicable enhancement payments for such practices will be announced by the NRCS concurrently with each annual sign-up notice.  *See id.* § 1469.23(d)(5)(iii).  In addition, the regulations provide that the NRCS may "set a not-to-exceed limit or variable payment rate for the enhancement payment in any given sign-up notice."  *See id.* § 1469.23(d)(6).  Far from establishing a precise amount of money to be paid or a clear standard for determining that amount, the CSP statute and its regulations provide the NRCS with broad discretion in setting the payments that may be received under a conservation security contract.

### (iv)   General Payment Provisions

In addition to providing the requisite discretion to establish the individual components of an annual payment, the implementing regulations further provide that the NRCS "may limit the stewardship, practice, and enhancement components of CSP payments in order to focus funding toward targeted activities and conservation benefits [it] identifies in the sign-up notice and any subsequent addenda."  *See* 7 C.F.R. § 1469.23(g).  Furthermore, the regulations note that "[i]n the event that annual funding is insufficient to fund existing contract commitments, the existing contracts will be pro-rated in that contract year."  *See id.* § 1469.23(h).  Within the broad constraints set forth in the CSP statute and its regulations, the NRCS enjoys substantial discretion in setting the payment amounts under conservation security contracts.  For that reason, it is clear that the CSP does not provide a clear standard for the payment of money, nor does it state the precise amounts that must be paid.  Accordingly, the CSP cannot be deemed to be a

money-mandating source under *Samish II* based on either of the first two prongs of that analysis.  *See Hoch v. United States*, 33 Fed. Cl. 39, 44 (1995) (holding that "when a statute uses discretionary language, but does not stipulate a sum certain, the statute is not money-mandating").

> **(b)     The CSP Statute and Its Implementing Regulations Do Not Compel the Payment of Money upon the Satisfaction of Certain Conditions**

Although the CSP does not meet either of the first two prongs of the *Samish II* inquiry, the court's money-mandating analysis of the statute is not at an end. Because the Federal Circuit lists the three prongs of the test in the disjunctive, a source will be deemed to be money mandating as long as it meets one of the three. However, the court concludes that the CSP also fails to satisfy the third prong of the test, *i.e.*, the CSP does not compel the payment of money upon the satisfaction of certain conditions.  While the CSP statute and implementing regulations do impose a number of necessary conditions upon participation in the program, the CSP contains too many gaps and incorporates too many contingencies within the discretion of the NRCS to be considered a money-mandating source of law under *Samish II*.

One of the most significant obstacles to plaintiffs' claims is the expansive discretion conferred upon the NRCS in establishing requirements for conservation security plans and the practices to be implemented under such plans.  Plaintiffs argue that the approval of conservation security plans is a ministerial act that merely requires the NRCS to determine whether such plans meet the requirements set forth in the CSP statute.  However, the only express requirements for conservation security plans set forth in the CSP statute appear in section 3838a(c)(1), which simply instructs that all plans:  (1) identify the land and resources to be conserved; (2) describe the contract tier and conservation practices proposed; and (3) contain a schedule for the conservation practices described.  16 U.S.C. § 3838a(c)(1).  While this section governs the form and general content of conservation security plans submitted under the CSP, it provides no substantive requirements for the establishment and approval of conservation security plans as would be necessary for the execution of that program.

In the absence of specific statutory requirements for conservation security plans, the language of the CSP statute allocates significant discretion to the NRCS

in that regard.  For example, the statute directs the NRCS to require, to the maximum extent practicable, that lowest cost alternatives be used in fulfilling the purposes of conservation security plans.  Such determinations regarding the eligibility of those conservation practices shall be made by the NRCS.  16 U.S.C. § 3838a(d)(1)(B)(ii).  Furthermore, while the CSP statute lists eighteen types of conservation practices which may be implemented as part of a conservation security plan, the statute also accords the NRCS discretion to add "any other conservation practices that the Secretary determines to be appropriate and comparable to other conservation practices described in this paragraph."  16 U.S.C. § 3838a(d)(4)(S).

Finally, the CSP statute, in directing that the NRCS establish three contract tiers to be available for conservation security plans, also provided that the minimum requirements for each tier of conservation contracts implemented under the plan "be determined and approved by the Secretary."  16 U.S.C. § 3838a(d)(6).  In that regard, the CSP statute requires that all three tiers of conservation security contracts must include conservation practices that will address one or more significant resource concerns on all or part of the agricultural operation at a level that meets the appropriate nondegradation standard.  *See id.* § 3838a(d)(5).  The statute provides that the NRCS must determine whether the proposed conservation practices will actually meet those objectives, *id.*, and defines the term, "nondegradation standard," as "the level of measures required to adequately protect, and prevent degradation of, 1 or more natural resources, as determined by the Secretary in accordance with the quality criteria described in handbooks of the Natural Resources Conservation Service."  *Id.* § 3838(8).  In short, the CSP statute directs the NRCS to establish the appropriate nondegradation standards on enrolled properties and allows the agency to narrow the range of permissible conservation practices to those that will meet those standards.

When viewed in light of the other statutory provisions discussed above, it is wholly implausible that Congress intended to require the NRCS to rubber-stamp a conservation security plan limited to the vague requirements set forth in section 3838a(c)(1) without regard to whether the plan would further the purposes of the CSP.  Plaintiffs' proposed interpretation of sections 3838a(b)(1) and 3838a(c)(1) is therefore an unreasonable reading of the CSP statute.  Because the NRCS possesses significant discretion in establishing the substantive requirements of conservation security plans, the court concludes that the CSP statute does not fulfill the third prong of *Samish II* and compel the payment of money by the government

41

upon the satisfaction of certain conditions by agricultural producers.

As the final step in its analysis of the third prong of *Samish II*, this court also concludes that the CSP regulations cannot be interpreted to compel the payment of money upon the satisfaction of certain conditions. The CSP regulations expressly provide the NRCS with discretion to limit eligibility in many areas where the statute is silent or ambiguous. Most important here, the regulations provide that enrollment during any given year will be limited to properties located within certain priority watersheds designated by the NRCS. *See* 7 C.F.R. § 1469.5(d)(1)(vi). But the list of selected watersheds, however, is not contained in the CSP regulations themselves. Rather, the regulations state that the NRCS will provide such a list prior to each annual sign-up period. *See id.* § 1469.6(a)(2).

Perhaps the most sweeping example of the discretion enjoyed by the NRCS under the regulations is contained in section 1469.2(b), which provides that the NRCS "may modify or waive a provision of [the CSP regulations] if [the NRCS] determines that the application of such provision to a particular limited situation is inappropriate and inconsistent with the goals of the program." *Id.* § 1469.2(b). Under that provision, the NRCS may waive or amend any requirement set forth in the regulations whenever the application of that requirement would be, in the view of the NRCS, inconsistent with the purposes of the CSP. While the CSP statute is silent or unclear as to whether the NRCS has the discretion to limit eligibility in the program based on criteria not contained in the statute, the CSP regulations render such discretion explicit and, in so doing, clearly reflect that these regulations do not compel the payment of money upon the satisfaction of certain conditions. For the foregoing reasons, the CSP – understood as encompassing the CSP statute and its implementing regulations – fails to meet any of the three prongs under *Samish II* and is therefore not a money-mandating source of law in this court.

## B.    Plaintiffs Have Failed to State a Claim under the CSP

In their complaint, plaintiffs allege that they meet all of the requirements for participation in the CSP set forth in both the CSP statute and its regulations, other than the requirement that a majority of the agricultural operation be located within one of the priority watersheds designated by the NRCS. Compl. ¶ 4. However, that equivocal statement is undermined by the undisputed facts alleged in plaintiffs' own complaint. The Supreme Court has noted that a complaint "requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. While a complaint is not required to contain detailed factual allegations, it must provide "enough facts to state a claim for relief that is plausible on its face." *Id.* at 570. In order to meet the requirement of facial plausibility, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S. Ct. 1937, 1949 (2009). Even if the court were to hold that the CSP is a money-mandating source for purposes of its jurisdiction under the Tucker Act, both Counts I and II of the complaint would have to be dismissed under RCFC 12(b)(6) because plaintiffs have failed to state a claim upon which relief can be granted.

First, plaintiffs' implied assertion that they have met all of the 'legitimate' requirements of the CSP statute is contradicted by the undisputed facts in this case. The CSP statute contains only two eligibility requirements for agricultural producers: (1) that the producer submit a conservation security plan to the NRCS and obtain approval of that plan from the agency; and (2) that the producer enter into a conservation security contract with the government. *See* 16 U.S.C. § 3838a(b)(1). Plaintiffs have failed to meet either of those requirements. Plaintiffs have not submitted a conservation security plan to the NRCS for approval, nor have they entered into a conservation security contract with the government. For that reason, Counts I and II of the complaint do not meet the minimal standard of facial plausibility required to survive a motion to dismiss under RCFC 12(b)(6).

Plaintiffs assert that they would have submitted a conservation security plan to the NRCS for approval, entered into a conservation security contract with the government, and performed the conservation activities set forth in the plan and contract, but for the watershed approach contained in the CSP regulations. *See* Pls.' Resp. at 36-38. Plaintiffs thus claim that their failure to submit a conservation security plan was grounded in the fact that to do so would have been a futile act in light of the watershed requirements. This court cannot disagree with plaintiffs that, based upon a reasonable reading of the controlling statute and regulations, plaintiffs would have been precluded from participation in the CSP program because a majority of their property admittedly was not located within any of the approved watersheds. As discussed in detail above, this court has held that the regulations setting forth the watershed requirements are not inconsistent with the CSP statute and must therefore be upheld since there is no basis for the court to set aside or ignore those requirements as set forth in the agency's regulations. Thus, whether viewed from a perspective that plaintiffs failed to submit a conservation

security plan for approval or viewed from a perspective that the watershed requirements precluded approval of any plan that plaintiffs could have submitted, both scenarios lead to the identical result – plaintiffs' failure to state a claim.[15]

Finally, defendant argues that plaintiffs have not demonstrated that they are entitled to any payments under the CSP statute because any such entitlement is dependent upon a number of contingencies that have not been satisfied in this case. The court agrees.  In responding to a question from the court during oral argument, counsel for plaintiffs highlighted the unusually speculative nature of their claims:

| | |
|---|---|
| THE COURT: | . . . What is the specific amount of money to which plaintiffs claim they are entitled under the statute?  Can you tell me that? |
| MR. SALTMAN: | That probably hasn't been calculated. It would depend on the exact practices that the client would apply for and what tier of contract, *i.e.*, how much of his land [he] is willing to do it for. I don't think that precise amount has been calculated. . . . |
| THE COURT: | But how, if that hasn't been calculated, can you say exactly how the court would calculate the specific amount? |
| MR. SALTMAN: | I think that the plaintiff would have to come and say, this is what I would have done. This is my intention.  I would have done the following four practices over 26 percent of my land, |

---

[15]/  To the extent that plaintiffs wished to assert that the watershed requirements improperly precluded plaintiffs' application for approval of their conservation security plan, such a claim appears to be more properly viewed as a challenge to the CSP implementing regulations under the APA.  *See supra* note 11.

and that would have generated under
the formula a precise amount per year.
So, I mean, it is calculable, and as I
said, it just depends on which
practices the client said that he would
have done.  And we could come up
with it to the penny.  I guess maybe
that's the answer to the question,
Your Honor.

Tr. at 37-38.  Even if the court were to indulge in the hypothetical exercise of
speculatively identifying what types of conservation practices plaintiffs might have
adopted on some unspecified portion of the Property during the time period in
question, plaintiffs' assertion that the payments for such conservation practices
could be calculated "to the penny" under the CSP statute is simply untenable in
light of the indeterminate nature of various provisions in the statute and its
implementing regulations.

In essence, plaintiffs ask this court to assume:  (1) that the NRCS had
promulgated regulations other than the ones that were actually adopted; (2) that
plaintiffs had submitted a conservation security plan pursuant to those hypothetical
regulations; (3) that the NRCS had approved plaintiffs' hypothetical conservation
security plan; (4) that plaintiffs had entered into a conservation security contract
with the NRCS to implement the hypothetical conservation security plan; and (5)
that plaintiffs had adopted an indeterminate, unspecified number of approved
conservation measures on some undetermined portion of their property pursuant to
their hypothetical contract between FY2004 and FY2010.  In addition, plaintiffs
request that the court award damages in the amount that they would have received
for implementing those unspecified conservation measures upon undetermined
portions of their property pursuant to their hypothetical conservation security
contract.  Clearly, the numerous variables and speculation required for such an
exercise would preclude any definitive assessment of loss or calculation of
damages.[16]  Accordingly, even if this court were to deem the disputed statute and

---

[16]/  Plaintiffs assert that they have already adopted various conservation measures on their
land and are therefore entitled to payments under the CSP.  *See* Pls.' Resp. at 38, App. F.
However, the "conservation measures" set forth in plaintiffs' declaration are little more than a

continue...

its implementing regulations to be money mandating, Counts I and II of plaintiffs' complaint would have to be dismissed inasmuch as they fail to state a claim upon which relief may be granted.

### C.     The Alleged Taking of Plaintiffs' Property

In Count III of the complaint, plaintiffs assert that defendant effected an uncompensated taking of their property in violation of the Takings Clause of the Fifth Amendment.  Because plaintiffs do not possess any compensable property rights in benefits under the CSP, their takings claim must be dismissed pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.

This court has jurisdiction over takings claims brought against the federal government under the Tucker Act.  *See Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008) ("It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction.").  However, before determining whether a particular governmental action has effected a taking of private property requiring the payment of just compensation, "as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment."  *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004).  *See also Colvin Cattle Co. v. United States*, 468 F.3d 803, 806 (Fed. Cir. 2006) (noting that "under our regulatory takings analysis, the threshold inquiry is 'whether the claimant has established a 'property interest' for purposes of the Fifth Amendment'") (citations omitted).  If the court determines that the interest alleged to have been taken is not a cognizable property right to which the Takings Clause of the Fifth Amendment applies, then the takings analysis can proceed no further.

---

[16]/  ...continue

recitation of the broad categories of conservation practices listed in section 3838a(d)(4) of the CSP statute.  As discussed herein, the NRCS is under no obligation to approve any of the specific practices that plaintiffs may have adopted as part of such a conservation security plan, nor is the agency required to make any precise payments based on the adoption of any such measures.  Furthermore, plaintiffs have acknowledged that – notwithstanding the conservation measures described in the declaration – any calculation of benefits under the CSP statute would require the court to engage in the speculative exercise of determining which practices plaintiffs *would have adopted* over some unspecified portion of their property.  *See* Tr. at 37-38.

There is no question that plaintiffs possess a cognizable property right in the ownership of their land.  However, plaintiffs do not assert that defendant has taken any interest in the Property.  Rather, plaintiffs contend that they have a protected property right in monetary benefits under the CSP.  Plaintiffs have not cited a single case in which a court has held that the denial of monetary benefits under a government program constitutes a taking requiring compensation under the Fifth Amendment.  For the reasons discussed below, the court holds that plaintiffs do not possess any property rights in monetary benefits under the CSP.

Plaintiffs first appear to suggest that the mere denial of government benefits effects an unconstitutional taking when the claimant has a vested legal entitlement to those benefits.  In support of that provocative assertion, plaintiffs direct the court's attention to two law review articles.[17]  However, the portions of the articles cited by plaintiffs – which are, of course, not binding on this court – merely discuss the range of interests that are entitled to some level of constitutional protection under the Due Process Clause.  The Federal Circuit has held that the term "property" as used in the Due Process Clause encompasses a much broader range of interests than the same term as used in the Takings Clause.  *See, e.g.*, *Adams v. United States*, 391 F.3d 1212, 1220 n.4 (Fed. Cir. 2004) ("Generally, entitlements are considered to be government conferred benefits, safeguarded exclusively by procedural due process.  In light of this, entitlements are often referred to as 'property interests' within the meaning of the Due Process Clause in cases decided under that clause, but such references have no relevance to whether they are 'property' under the Takings Clause.") (citation omitted).  While the suspension of government benefits might trigger a right to pre-deprivation notice and a hearing under the Due Process Clause, the denial of those same benefits does not require the payment of just compensation under the Takings Clause.

During oral argument, counsel for plaintiffs appeared to retreat from the assertion that all benefits under an entitlement program are property for purposes of the Takings Clause.  *See* Tr. at 33-34 (conceding that "[t]here are a lot of arguments as to why benefits under an entitlement program *per se* do not constitute

---

[17]/  The two articles cited by plaintiffs in support of their argument are Thomas W. Merrill, *The Landscape of Constitutional Property*, 86 Va. L. Rev. 885 (2000), and Note, *Statutory Entitlement and the Concept of Property*, 86 Yale L. J. 695 (1977).  Plaintiffs also provide a citation to Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559 (2007), as a counterpoint to the two articles upon which they rely.

Fifth Amendment [cognizable] property").  However, plaintiffs continue to advance the related argument that a statute creates a compensable property right whenever it requires an entitlement to benefits to be reduced to a binding contract between the recipient and the government.  As discussed below, that argument is similarly unavailing.

First, the principal authority upon which plaintiffs attempt to base their argument – like the law review articles from which they also seek support – does not even involve the Takings Clause.  In *Dodge v. Bd. of Educ. of Chicago*, 302 U.S. 74 (1937), the Supreme Court addressed a constitutional challenge to the amendment of a state statute, which reduced the annuity payments to which retired schoolteachers had been entitled under the original statute.  The plaintiffs in that case argued that the amendment violated the Obligation of Contracts Clause of Article I, § 10, and deprived them of a vested right without due process of law. The Supreme Court affirmed the dismissal of the plaintiffs' claims, holding that the original statute did not demonstrate an intent on the part of the state to enter into a contract with the beneficiaries of the statute and thus did not create any vested rights protected by the Obligation of Contracts Clause of Article I or the Due Process Clause of the Fourteenth Amendment.  In reaching its decision, the Supreme Court remarked that "[i]n determining whether a law tenders a contract to a citizen, it is of first importance to examine the language of the statute.  If it provides for the execution of a written contract on behalf of the state, the case for an obligation binding upon the state is clear."  *Dodge*, 302 U.S. at 78 (citing *Hall v. Wisconsin*, 103 U.S. 5 (1880)).  It is that statement upon which plaintiffs rest their argument.  In support of that statement, however, the Court cited a case in which a state had actually entered into written contracts with private citizens pursuant to a statute, and later refused to honor its obligations under those contracts because the authorizing statute had been repealed.  Those cases have no clear application here, where there is no allegation that plaintiffs have ever entered into a contract with the government.

In addition, a number of the cases cited by plaintiffs merely stand for the unremarkable proposition that a person may possess a protected property interest in contractual rights.  *See United States v. Winstar*, 518 U.S. 839, 876 (1996); *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 52 (1986); *Lynch v. United States*, 292 U.S. 571, 576-77 (1934); *Cienega Gardens v. United States*, 331 F.3d 1319, 1329 (Fed. Cir. 2003).  In this case, however, plaintiffs do not have any contractual rights that might be construed as property rights.  Although

plaintiffs acknowledge that they did not enter into a conservation security contract with the NRCS, plaintiffs nonetheless contend that they have been denied a vested right because "the law considers done that which ought to have been done." Pls.' Resp. at 41 (citing *Antonious v. Spalding & Evenflo Co.*, 281 F.3d 1258 (Fed. Cir. 2002); *Skaradowski v. United States*, 471 F.2d 627 (Ct. Cl. 1973); *Diamond v. United States*, 176 Ct. Cl. 1103 (1966)). While the court notes the utility of that equitable maxim when it is necessary to "right an obvious injustice[,]" *see Skaradowski*, 471 F.2d at 632, its use would be wholly inappropriate in this case. After a careful review of the facts and controlling law in this case, this court does not reach the conclusion that the adoption of the CSP regulations has resulted in an "obvious injustice." Because plaintiffs have failed to identify any protected property rights that might provide the basis for their takings claim, the court must dismiss that claim under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. *See Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005) (holding that a court may not proceed to the second step of the takings analysis without first finding that the plaintiff possessed a cognizable property interest under the Fifth Amendment).

For all of the foregoing reasons, the court hereby grants defendant's motion to dismiss the complaint. Counts I and II of plaintiffs' complaint are therefore dismissed without prejudice under RCFC 12(b)(1) for lack of subject matter jurisdiction. Count III of plaintiffs' complaint is dismissed with prejudice under RCFC 12(b)(6) for failure to state a claim.

## CONCLUSION

Accordingly, it is hereby **ORDERED** that:

(1) Plaintiffs' Motion to Correct Appendix A, filed March 5, 2010, is **GRANTED**, and the corrected Appendix A is deemed filed as of that date;

(2) Defendant's Motion to Dismiss, filed January 4, 2010, is **GRANTED**;

(3) Plaintiffs' Motion for Summary Judgment on Count I of the Complaint, filed November 10, 2009, is **DENIED** as moot;

(4)     Plaintiffs' Motion for Class Certification, filed September 30, 2010, is **DENIED** as moot;

(5)     Plaintiffs' Motion for Leave to File First Amended Complaint, filed September 30, 2010, is **DENIED** as moot;

(6)     The Clerk's Office is directed to **ENTER** final judgment in favor of defendant, **DISMISSING** Counts I and II of the complaint without prejudice and Count III of the complaint with prejudice; and

(7)     Each party shall bear its own costs.

/s/Lynn J. Bush
LYNN J. BUSH
Judge